In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 19-3343

ROBERT GACHO,

*Petitioner-Appellant,*

*v.*

ANTHONY WILLS,

*Respondent-Appellee.*

―――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 0257 — **Robert W. Gettleman**, *Judge.*

―――――――――

ARGUED NOVEMBER 5, 2020 — DECIDED FEBRUARY 8, 2021

―――――――――

Before SYKES, *Chief Judge*, and HAMILTON and SCUDDER,
*Circuit Judges*.

SYKES, *Chief Judge*. Robert Gacho is serving a life sentence
for the 1982 kidnapping and murders of Aldo Fratto and
Tullio Infelise. Cook County Circuit Judge Thomas Maloney
presided in his case. Maloney was corrupt; for years he lined
his pockets by soliciting cash for acquittals. To deflect atten-
tion and up the ante for bribes, he came down hard on
defendants who could not (or would not) pay. Maloney's

corruption was exposed in 1991, and he was sent to federal prison. Gacho has been pursuing state and federal collateral relief ever since.

Gacho was charged and tried jointly with codefendant Dino Titone, though the latter waived his right to a jury verdict and opted for a decision from the bench. The reason became clear later: Titone paid Maloney $10,000 for an acquittal. But as federal investigators began closing in, Maloney reneged and found Titone guilty. The jury returned a guilty verdict against Gacho.

After Maloney was indicted, Titone won a new trial based on judicial bias, but Gacho's postconviction proceedings dragged on for decades. In 2016 the Illinois Appellate Court finally resolved his claims and denied relief. As relevant here, the court rejected his due-process claim based on Maloney's corruption. The court held that Gacho needed to prove that the judge was actually biased against him and had not done so. A district judge reviewed that decision under 28 U.S.C. § 2254 and denied habeas relief.

We reverse. The Due Process Clause secures a right to trial before a fair and impartial judge. Evidence that the presiding judge was actually biased is sufficient to establish a due-process violation but it's not necessary. Constitutional claims of judicial bias also have an objective component: the reviewing court must determine whether the judge's conflict of interest created a constitutionally unacceptable likelihood of bias for an average person sitting as judge. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 878–86 (2009). The state court cited *Caperton* but ignored the objective test, holding that Gacho's failure to establish actual bias was fatal to his claim.

That ruling was contrary to federal law as explained in *Caperton*, so we review the claim without deference to the state court. We hold that the acute conflict between Maloney's duty of impartiality and his personal interest in avoiding criminal liability created a constitutionally unacceptable likelihood of compensatory bias in Gacho's case. The judge took a bribe from Gacho's codefendant and promised to rig the joint trial in his favor, then reneged to evade detection. Under these circumstances Gacho—no less than Titone—was deprived of his due-process right to trial before an impartial judge. He is entitled to habeas relief.

## I. Background

The history of this case spans almost four decades. We traced the background when Gacho's habeas proceedings were last before this court. *Gacho v. Butler*, 792 F.3d 732, 733–34 (7th Cir. 2015). Additional detail can be found in the Illinois Supreme Court's decision on direct appeal. *People v. Gacho*, 522 N.E.2d 1146, 1150–52 (Ill. 1988). For present purposes a summary will suffice.

On the morning of December 12, 1982, a DuPage County forest ranger spotted a parked car in a remote area near the Des Plaines River. *Id.* at 1150. As the ranger approached, he heard pounding coming from inside the trunk. He summoned the police, and together they opened the trunk, finding Fratto and Infelise inside, both bound and shot multiple times. Fratto was dead, and Infelise was barely conscious. When the ranger asked Infelise who did this to him, he replied, "Robert Gott or Gotch," "Dino," and "Joe." *Id.* at 1150–53. Infelise died of his wounds about two weeks later.

Gacho was arrested and confessed. Together with Titone and Joe Sorrentino, he was charged in Cook County Circuit Court with kidnapping, armed robbery, and double murder. Gacho moved to suppress his confession, claiming that the police beat him and ignored his request for counsel. *Id.* at 1152–54. That motion failed. *Id.* at 1154. In addition to the confession, the prosecution's case included testimony from Gacho's girlfriend, who had witnessed the key events. *Id.* at 1157–61.

The case against Sorrentino was severed, but Gacho and Titone were tried jointly in Judge Maloney's court. The proceedings had an unusual twist: the charges against Gacho were submitted to the jury, but Titone waived a jury verdict and requested a decision from the bench. Both men were found guilty and sentenced to death. The Illinois Supreme Court vacated Gacho's death sentence, *id.* at 1166, and on remand he was resentenced to life in prison.

As the world now knows, Judge Maloney was corrupt. The Operation Greylord undercover investigation caught Maloney in a long-running shakedown. Throughout the 1980s he solicited and accepted bribes to fix cases. In 1991 a federal grand jury indicted him on racketeering and extortion charges; he was convicted in 1993 and sentenced to a 15-year term in federal prison. *Bracy v. Gramley*, 520 U.S. 899, 901–02 (1997); *see also United States v. Maloney*, 71 F.3d 645, 650–52 (7th Cir. 1995). He died in 2008 not long after his release from custody.

Maloney's willingness to take bribes for acquittals had a sinister flip side. To deflect suspicion from his criminal scheme and give defendants an incentive to cough up bigger bribes, Maloney built a reputation as one of the most ruth-

less judges on the Cook County bench. We detailed his propensity to engage in so-called "compensatory" or "camouflaging" bias in our decision in *Bracy v. Schomig*, 286 F.3d 406, 412 (7th Cir. 2002) (en banc). *Bracy* involved a different murder case in Maloney's court, but we discussed the judge's misconduct in the Titone case and the effect of "camouflaging" bias, explaining that Titone "gave Maloney a $10,000 bribe, but Maloney convicted him anyway," and that a state trial judge later vacated Titone's conviction "because Maloney had a motive to convict Titone to deflect suspicion from himself." *Id.*

Meanwhile, Gacho—the man sitting next to Titone at trial—also sought state collateral relief, but the proceedings moved at a glacial pace. He filed a pro se postconviction motion in 1991 soon after the indictment against Maloney was unsealed. Among other claims, he alleged a due-process violation arising from Maloney's corruption; he also asserted that Daniel Radakovich, his attorney, pressured him to raise $60,000 to bribe Maloney, but he was unable to come up with the money. Gacho amended his petition through appointed counsel in 1997 and again in 2008. The Cook County Circuit Court dismissed Gacho's petition in 2009, but the Illinois Appellate Court reversed the dismissal of the judicial-bias claim and remanded for an evidentiary hearing.[1] *People v. Gacho*, 967 N.E.2d 994, 1004 (Ill. App. Ct. 2012).

---

[1] The court also remanded for an evidentiary hearing on Gacho's claim that his attorney's conflict of interest amounted to constitutionally ineffective assistance of counsel. The state court eventually rejected this claim too, as did the district judge in this § 2254 proceeding. Gacho asks us to review that claim, but it is not within the scope of his certificate of appealability, which is limited to the judicial-bias claim.

The hearing focused on Maloney's bias. Gacho testified about Radakovich's recommendation to bribe Maloney; he also submitted affidavits from his mother and aunt (both now deceased) stating that Radakovich had approached them about raising money for a bribe. Gacho testified that when he and his family were unable to come up with the money, Radakovich became disinterested in his case. Radakovich, testifying for the state, denied having any conversation with Gacho or his family about a bribe and asserted that he was actively involved in Gacho's defense.

Gacho also presented evidence that Titone bribed Maloney. In an affidavit, Titone's father stated that he paid Maloney $10,000 to "fix the case." He also stated:

> Judge Maloney was coming up for an election for judicial retention in the fall of 1984. [Dino Titone's attorney] said that as long as Maloney got two out of the three it would be enough. This meant that as long as my son's two co-defendants (Robert Gacho and Joe Sorrentino) were found guilty, Judge Maloney could get away with letting Dino go free and Judge Maloney could still get elected.

Following the hearing, the judge credited Radakovich's testimony, discredited Gacho's, and denied relief.

The Illinois Appellate Court affirmed. *People v. Gacho*, 53 N.E.3d 1054 (Ill. App. Ct. 2016). The court deferred to the postconviction judge's refusal to credit Gacho's testimony that Radakovich proposed bribing Maloney to fix his case. *Id.* at 1061. The court accepted, however, that Titone bribed Maloney. *Id.* (citing *Bracy*, 286 F.3d at 412, and *United States*

*ex rel. Titone v. Sternes*, No. 02 C 2245, 2003 WL 21196249, at
*1 (N.D. Ill. May 15, 2003)).

With that factual premise in place, the court addressed
Gacho's claim of compensatory judicial bias. The court noted
*Caperton*'s objective standard but did not apply it, holding
instead that a claim of compensatory bias requires evidence
that the judge was "actually biased in the defendant's own
case." *Id.* at 1063. The court explained that the postconviction
judge had considered "the possibility that Maloney com-
promised [Gacho's] rights during the trial but could not find
one questionable ruling," and that Gacho had "failed to
bring any questionable ruling to this court's attention." *Id.*
(quotation marks omitted). Finding no evidence that
Maloney was actually biased against Gacho as a result of the
bribe from his codefendant, the court rejected the claim. *Id.*
The Illinois Supreme Court denied review.

Gacho sought habeas review under § 2254.[2] He raised
18 claims, including a due-process claim based on Maloney's
corruption. In a lengthy opinion, the district judge rejected
each one. Regarding the judicial-bias claim, the judge con-
cluded that the state court's application of an actual-bias

[2] Gacho also petitioned for federal habeas relief in 1997, 1999, 2007, and
2013 based on the delay in his state-court postconviction proceedings.
The district court declined to excuse Gacho from the requirement that he
exhaust state remedies, concluding that much of the delay was attributa-
ble to Gacho's counsel and that after the state court's initial ruling in
2009, the proceedings appeared to move at a reasonable pace. *Gacho v.
Harrington*, No. 13 C 4334, 2013 WL 5993458, at *2 (N.D. Ill. Nov. 7, 2013).
Gacho asked us to review that decision, but we dismissed his appeal
because the district court's order was nonfinal. *Gacho v. Butler*, 792 F.3d
732, 737 (7th Cir. 2015).

requirement, though questionable, was not contrary to or an unreasonable application of federal law. *See* § 2254(d). The judge denied relief across the board but granted a certificate of appealability on the judicial-bias claim. Gacho appealed, and we appointed counsel for him under the terms of the Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B).

## II. Discussion

Federal-court review of state convictions is limited in scope. Section 2254(d)(1) provides that a federal court may not grant habeas relief on any claim that the state court has adjudicated on the merits unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." As relevant here, a state court's decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Brown v. Payton*, 544 U.S. 133, 141 (2005). If a state prisoner surmounts the high bar set by § 2254(d)(1), then we review his claim de novo under the traditional habeas standard, asking whether "he is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a); *Mosley v. Atchison*, 689 F.3d 838, 853 (7th Cir. 2012).

## A. Due Process and the Conflicted Judge

"It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton*, 556 U.S. at 876 (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). Most judicial conflict-of-interest issues are governed by standards set in state and federal disqualification statutes and judicial codes of conduct, but the Due Process Clause sets a constitu-

tional baseline. *Id.* at 876–77; *see* U.S. CONST. amend. V; *see id.* amend. XIV, § 1.

This case turns on the distinction between the subjective and objective components of the framework for evaluating the constitutional implications of judicial conflicts of interest. The central question is this: Must a litigant prove *actual* bias to establish that his trial before a conflicted judge violated his right to due process, or does the doctrinal test also entail an objective inquiry? The Supreme Court's decision in *Caperton* marked a watershed in this body of constitutional law by making clear that testing for actual, subjective bias is not the end of the inquiry; "the imperatives of due process" require application of an objective standard in all cases, "whether or not actual bias exists or can be proved." 556 U.S. at 886.

To understand *Caperton*'s significance, it's useful to step back and trace the decades of caselaw leading up to it. Before *Caperton* the Court had historically recognized two categories of cases in which a risk of bias, rather than actual bias, triggered constitutional scrutiny. The first category comprises the pecuniary-interest cases—adjudications by judges with a financial interest in the outcome. The earliest case of this type, *Tumey v. Ohio*, 273 U.S. 510 (1927), involved a small-town mayor who was authorized to preside over trials for unlawful possession of alcoholic beverages and received a salary bonus for each conviction, with the funds coming from the fines he imposed and the balance going into the municipal fisc, *id.* at 520–22. This arrangement, the Court observed, created an "official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535.

The Court explained that the Due Process Clause incorporates the common-law principle that a judge with a "direct, personal, [and] substantial pecuniary interest" in a case is disqualified from hearing it. *Id.* at 523. Extrapolating from this principle, the Court held that the mayor–judge's direct pecuniary interest in the outcome of the cases—more specifically, his pecuniary interest in *convictions*—violated the due-process rights of persons who came before him accused of alcohol-possession violations. This was so whether or not the judge was actually biased:

> There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Id.* at 532.

Since *Tumey*, the Court has expanded the understanding of what it means to hold a "direct" and "substantial" pecuniary interest in the outcome of a case. For example, in *Ward v. Village of Monroeville*, 409 U.S. 57 (1972), the Court considered a mayor–judge scheme similar to the one at issue in *Tumey* but minus the salary supplement. The Court began by

explaining that the absence of a *personal* pecuniary interest did not change the analysis. "The fact that the mayor [in *Tumey*] shared directly in the fees and costs did not define the limits of the [due-process] principle." *Id.* at 60. Rather, an unacceptable "temptation" to convict "may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id.* "This, too," the Court held, "is a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him.'" *Id.* (quoting *Tumey*, 273 U.S. at 534).

The Court went even further in *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1986). There a justice on the Alabama Supreme Court was a plaintiff in two lawsuits against insurance companies alleging bad-faith failure to pay claims; one suit was brought as a proposed class action and both sought punitive damages from the insurers. *Id.* at 817. While the suits were pending, the justice cast the deciding vote in favor of the plaintiffs in a case raising nearly identical legal issues about insurers' bad-faith failure to pay claims. *Id.* at 822. The Supreme Court held that the justice's role as a plaintiff in a highly similar case gave him a "direct, personal, substantial, [and] pecuniary" stake in the case before his court. *Id.* at 824 (quoting *Ward*, 409 U.S. at 60). The Court emphasized that it was not necessary to decide whether the justice was in fact biased but only whether the conflict of interest "would offer a possible temptation" to the average judge to tip the balance in the plaintiffs' favor. *Id.* at 825 (quoting *Ward*, 409 U.S. at 60). Applying this objective test,

the Court held that the justice's participation in the case violated the insurer's right to due process. *Id.*

The second set of cases in which charges of judicial bias traditionally raised constitutional concerns includes those in which the conflict arose by virtue of the judge's prior participation in the proceedings. *Murchison*, 349 U.S. 133, the so-called "one-man grand jury" case, is an example. There a judge sitting as a secret "judge–grand jury"—a procedure permitted by state law—interrogated two witnesses, charged them with perjury and contempt, then tried and convicted them. *Id.* at 135. Applying *Tumey*, the Court needed only a few short paragraphs to reject this procedure as inconsistent with the requirements of due process. *Id.* at 136–37. Such a system, the Court reasoned, violates the principle that "no man can be a judge in his own case." *Id.* at 136. The Court concluded: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *Id.*; s*ee also Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971) (holding that a judge who charged a litigant with contempt for salacious personal attacks could not preside over the litigant's contempt proceedings because "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication").

Each of these cases applied an objective standard, though it was phrased in a variety of ways. In *Tumey* the Court focused on the "possible temptation" to bias, 273 U.S. at 532; in *Murchison* the Court examined the "practical" difficulty of remaining free from bias, 349 U.S. at 138; in *Mayberry* the Court considered the "likel[ihood]" of a fair adjudication,

400 U.S. at 465. Regardless of how the standard was phrased, proof of actual bias was not required.

## B. *Caperton v. A.T. Massey Coal Co.*

That's where things stood before *Caperton*. Courts debated whether the objective inquiry applied broadly or was limited to pecuniary-interest and criminal-contempt cases. *Compare Railey v. Webb*, 540 F.3d 393, 413 (6th Cir. 2008) (describing the probability-of-bias rule as limited to "only two (perhaps three), very specific situations"), *and Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (similar), *with Jones v. Luebbers*, 359 F.3d 1005, 1012–13 (8th Cir. 2004) (applying *Tumey*'s and *Murchison*'s potential-for-bias rule generally, including to an allegation that a trial judge's feud with a public defender created an unconstitutional risk of bias), *and Bracy*, 286 F.3d at 434–35 (Rovner, J., concurring in part and dissenting in part) (proposing that *Tumey*, *Murchison*, and *Lavoie* support applying an objective, possibility-of-bias approach to compensatory-bias claims).

*Caperton* settled the debate, making clear that the objective standard applies uniformly as an implementing doctrine for the constitutional guarantee of due process. 556 U.S. at 881–87. The specific conflict of interest at issue in *Caperton* raised a question unique to elected state judiciaries: When (if ever) does an elected judge have a due-process obligation to recuse himself because of campaign contributions? The facts of the case placed the problem in sharp relief. The plaintiff Hugh Caperton won a $50 million judgment against A.T. Massey Coal Co. As the coal company's appeal wound its way to the West Virginia Supreme Court, CEO Don Blankenship created an independent political action committee to defeat an incumbent justice and elect his challenger. *Id.*

at 873. Blankenship contributed $3 million to that effort, which dwarfed the total spending by the campaign committees of both candidates combined. *Id.* The investment paid off. The challenger, Brent Benjamin, was elected. *Id.*

Caperton moved to disqualify the new justice, arguing that recusal was required under the judicial code of conduct and as a matter of due process. *Id.* at 873–74. Justice Benjamin denied the motion. The state supreme court eventually ruled for the company and reversed the $50 million verdict, with Benjamin casting the decisive vote. *Id.* at 874–75.

The Supreme Court reversed, holding that Justice Benjamin's participation violated Caperton's right to due process. *Id.* at 885–87. After surveying its due-process cases regarding conflicted judges, the Court explained that constitutional claims based on judicial bias have both subjective and objective components. The existence of actual bias, of course, requires recusal as a matter of due process, but the subjective inquiry "is just one step in the judicial process; objective standards may also require recusal whether or not actual bias exists or can be proved." *Id*. at 886. Mapping the objective test onto the campaign-contribution question, the Court held that "[d]ue process requires an objective inquiry into whether the contributor's influence on the election under all the circumstances 'would offer a possible temptation to the average … judge to … lead him not to hold the balance nice, clear[,] and true.'" *Id*. at 885 (quoting *Tumey*, 273 U.S. at 532).

Applying that standard to the case at hand brought two key facts to the surface: Blankenship's enormous monetary contribution had a "significant and disproportionate influ-

ence" on Justice Benjamin's successful campaign, and the coal company's challenge to the $50 million judgment was then pending and soon would be before the state supreme court. *Id.* at 885–86. This combination of circumstances created a "serious, objective risk of actual bias that required Justice Benjamin's recusal." *Id.* at 886.

It did not matter that Justice Benjamin had "conducted a probing search" and concluded that he was not biased. *Id.* at 882 ("We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias."). Instead, the Court emphasized the need for an objective test:

> The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules. … In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, *the Due Process Clause has been implemented by objective standards that do not require proof of actual bias*. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the [conflict of] interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

*Id.* at 883–84 (emphasis added) (citations omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). In the end, the Court stated its rule broadly and bluntly: "The failure to

consider objective standards requiring recusal is not con-
sistent with the imperatives of due process." *Id.* at 886.

The Court emphasized that the circumstances in the case
were "extreme by any measure," *id.* at 887, adding that the
objective constitutional standard does not displace codes of
conduct and disqualification statutes as the primary sources
of rules for most conflict-of-interest questions, *id.* at 890.
"Because the codes of judicial conduct provide more protec-
tion than due process requires, most disputes will be re-
solved without resort to the Constitution." *Id.* Still, "extreme
cases are more likely to cross constitutional limits, requiring
this Court's intervention and formulation of objective stand-
ards. This is particularly true when due process is violated."
*Id.* at 887.

## C. The Illinois Appellate Court's Decision and § 2254

The Illinois Appellate Court acknowledged *Caperton* but
declined to apply the objective standard. Instead, the court
concluded that the Supreme Court's decision in the *Bracy*
litigation controlled. *Gacho*, 53 N.E.3d at 1062–63 (citing
*Bracy*, 520 U.S. at 908–09). Moreover, the court read *Bracy* to
require proof of actual bias in all claims of compensatory
bias.

That ruling was contrary to both *Caperton* and *Bracy*.
First, as we have already explained at length, *Caperton*
announced a general rule: Due-process claims based on
judicial bias require an objective assessment of the likelihood
of bias, not just a subjective assessment of actual bias. Noth-
ing in the Court's opinion suggests that it was limiting the
application of this rule to campaign-contribution cases. To
the contrary, the Court's reasoning rested largely on concerns

about the administrability of a rule requiring proof of actual bias, *see* 556 U.S. at 883, and those concerns are present in all cases.

Second, the state court's reading of *Bracy* was mistaken. True, *Bracy* involved a claim of compensatory bias in another case tried in Judge Maloney's court; William Bracy alleged that Maloney engaged in camouflaging bias in his case to conceal his bribes in other cases. 520 U.S. at 905. The issue before the Court, however, was quite narrow. The case concerned only whether Bracy had made an adequate preliminary showing of Maloney's bias to establish good cause to take discovery on his claim. The Court held that he had done so and was entitled to discovery. *Id.* at 909. In other words, the Court's discussion of actual bias made sense in context because Bracy had supported his discovery request with some evidence of Maloney's actual bias in his case. *Bracy* thus stands for the unsurprising proposition that evidence of actual bias is *sufficient* to establish a due-process violation, but it does not follow that actual bias is a *necessary* condition for relief. That is, the Court was not silently limiting *Tumey*, *Murchison*, and other cases that applied an objective risk-of-bias standard. It had no reason to address the objective standard because the facts at hand suggested more.

For all these reasons, Gacho has satisfied § 2254(d). The state court's decision was contrary to federal law as established by the Supreme Court in *Caperton* and *Bracy*. We therefore review his claim de novo. Applying the objective standard, we ask "whether the average judge in [Maloney's] position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U.S. at 881. Judicial-bias claims are not subject to harmless-error

review, *Edwards v. Balisok*, 520 U.S. 641, 647 (1997), so Gacho is entitled to relief if the judge's conflict of interest created a constitutionally intolerable likelihood of compensatory bias in his case.

We begin with the obvious and important observation that Titone's bribe cannot be separated from Gacho's case. Everyone accepts that Titone did not get a fair trial because of the bribe, yet the State asks us to conclude that the same judge—ruling on the admissibility of the same evidence, presiding over the examination of the same witnesses, and imposing sentence on both defendants—could have been neutral in Gacho's case. That defies practical reason. Any decisions Maloney made in Titone's case based on his desire to deflect scrutiny from the Operation Greylord investigators would necessarily affect Gacho too. It is irrelevant that Gacho was convicted by a jury rather than Maloney himself. *Cartalino v. Washington*, 122 F.3d 8, 10 (7th Cir. 1997); *cf. Ward*, 409 U.S. at 61–62 (holding that an opportunity for impartial appellate review does not excuse the trial judge's bias). No reasonable person could accept that Maloney would be neutral in the joint trial after he accepted a bribe from Gacho's codefendant and then reneged on the deal out of self-preservation.

To be sure, *Caperton* emphasized that the due-process line is crossed in only extreme cases. 556 U.S. at 887, 890. But Maloney's bribery scheme was at work in this very case, so the circumstances can fairly be called extreme. *Bracy*, 286 F.3d at 411 ("Maloney's dereliction of duty casts … an unusual light and makes it hard to put Maloney in any normal framework."). We're satisfied that the likelihood of

compensatory bias was too great to be constitutionally tolerable.

Accordingly, Gacho was deprived of his due-process right to be tried before a fair and impartial judge. We REVERSE the district court's judgment and REMAND with instructions to grant the writ.