2024 IL App (1st) 232363

SECOND DIVISION
February 22, 2024

No. 1-23-2363B

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | |
|  | ) | Appeal from the |
| Plaintiff-Appellee | ) | Circuit Court of |
|  | ) | Cook County |
|  | ) | |
| v. | ) | 83 C 12702 |
|  | ) | |
| JOSEPH SORRENTINO, | ) | Honorable |
|  | ) | Adrienne E. Davis, |
| Defendant-Appellant | ) | Judge Presiding |
|  | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Cobbs and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Joseph Sorrentino was convicted by a jury in the mid-1980s of a violent double kidnapping, armed robbery, and murder. But the judge overseeing his trial proceedings, Thomas Maloney, was later discovered in the federal investigation known as Operation Greylord to be fixing cases for bribes—including in the joint trial in which defendant was tried. One of his codefendants, Dino Titone, opted for a bench trial and gave Maloney $10,000, while another codefendant, Robert Gacho, chose to have a jury weigh his guilt. See *Gacho v.* Wills, 986 F.3d 1067, 1068 (7th Cir. 2021). Though defendant's trial was severed from those of his codefendants, Judge Maloney still oversaw the proceedings. Defendant was convicted by a jury and eventually sentenced to life in prison.

¶ 2     Judge Maloney was ultimately convicted of bribery charges and sentenced to 15 years in prison. Meanwhile, defendant and his codefendants continued to challenge their convictions. In 2021, codefendant Gacho found success. The Seventh Circuit Court of Appeals overturned his conviction, holding that Gacho was denied his right to be tried before a fair and impartial judge. *Id.* at 1076. Defendant then filed a new postconviction petition to vacate his conviction on the same grounds, which the State joined. His original conviction was overturned. The State has elected to prosecute him again.

¶ 3     Today, more than 41 years after the murders for which defendant was convicted, this case is back to square one. But instead of being a healthy young man who had just turned 20, defendant is now age 61, confined to a walker, ill with liver cancer, and in need of a transplant.

¶ 4     Defendant sought pretrial release under our recently amended statute that eliminated cash bail. The State moved to detain defendant before trial, arguing that the crimes of which he was accused merited detention in the county jail. Defendant, meanwhile, presented live testimony from his sister and a former cellmate—whose conviction was likewise vacated—who said they would take responsibility for defendant if he was released, as well as a mountain of evidence detailing his many medical ailments and needs.

¶ 5     The court sided with the State and denied defendant release before trial. He appeals, arguing that he does not present a real and present threat in his advanced age and medical condition, and even if he does, there are conditions that would sufficiently mitigate that danger to permit his release.

¶ 6     We reverse the finding that defendant is a real and present threat to the community or to any particular individual. We remand the matter to the circuit court for the imposition of whatever conditions of pretrial release the court deems appropriate.

¶ 7                                                    BACKGROUND

¶ 8      On the morning of December 12, 1982, a Du Page County forest ranger spotted a car parked in a remote area by the Des Plaines River. The ranger approached the car to investigate and heard pounding coming from inside the trunk. Police quickly arrived on the scene and found two men, Aldo Fratto and Tullio Infelise, inside. Both had been shot multiple times. Fratto was already dead, but Infelise, on the cusp of death, told police that "Robert Gott or Gotch," "Dino," and "Joe" had shot them. Infelise died two weeks later.

¶ 9      Defendant, Gacho, and Titone were all later arrested, tried, and convicted of murder. As noted, the judge overseeing proceedings in all three cases was Judge Maloney. After exhausting his direct and collateral appeals, defendant's hopes of getting a new trial appeared extinguished until the Seventh Circuit granted Gacho *habeas* relief in 2021. See *id.* at 1068. Until then, only Titone—who had paid for an acquittal but was convicted when Judge Maloney reneged on the deal—had established that Judge Maloney's bias prejudiced him so much that his trial proceedings were irrevocably tainted. *Id.*

¶ 10     It mattered not to the Seventh Circuit that Gacho, himself, had not paid off Judge Maloney; Gacho had proven Judge Maloney to be so objectively biased that Gacho did not need to prove the corrupt judge actually harmed his case. No reasonable person could accept that Judge Maloney would be neutral in a joint trial after the judge accepted a bribe from Titone, Gacho's codefendant. *Id.* at 1075-76.

¶ 11     With the federal court having spoken, defendant filed a new postconviction petition in the circuit court in June 2022. The State joined, and the circuit court vacated defendant's conviction and ordered a new trial. Defendant was remanded from the Illinois Department of Corrections to the Cook County Jail and held without bail.

¶ 12 On November 6, 2023, defendant filed a motion for pretrial release under the new statutory provisions that had gone into effect in September. See *Rowe v. Raoul*, 2023 IL 129248. At the same time, the State filed a petition seeking pretrial detention, also under the new statutory scheme.

¶ 13 Two weeks later, on November 20, 2023, the court held a hearing on both motions. As is customary, the State proceeded by way of proffer, both written and oral. We take the facts of the charged crime, as relevant to this appeal, from that proffer.

¶ 14 On December 11, 1982, defendant, Titone, and Gacho allegedly planned to rob a couple of local drug dealers. Gacho contacted Fratto and Infelise, telling them he wanted to buy drugs. Fratto and Infelise went to Gacho's home, where once inside, Gacho, Titone, and defendant held them at gunpoint and robbed the pair of drugs and money. Gacho then called his girlfriend at the time to come over with her car. She did, and Gacho went outside and got into her vehicle.

¶ 15 While Gacho and his girlfriend were in her car, defendant and Titone brought out the victims, who had now been bound, and put them in Fratto's car. With the victims incapacitated in the back, defendant and Titone drove to a wooded area near the Des Plains River in Lemont. Gacho and his girlfriend followed in their car. Once there, defendant and Titone put the victims in the trunk of the car and shot them multiple times. Defendant and Titone got into Gacho's girlfriend's car. All four drove back to Chicago. The ranger found the bodies the next day.

¶ 16 Police quickly moved to arrest defendant, Gacho, and Titone. After defendant was arrested, he gave a court-reported statement implicating himself in the crime. He said he used a .25-caliber handgun in the shooting, and .25-caliber bullets were found in both victims' bodies. The State also alleged that defendant was a member of the Latin Kings gang at the time of the murders.

¶ 17　Based on these facts, the State argued that (1) the proof was evident or the presumption great that defendant committed kidnapping, armed robbery, and first-degree murder; (2) the defendant posed a real and present threat to the community if released; and (3) no condition or set of conditions could mitigate that threat.

¶ 18　Unlike the State, defendant called live witnesses to testify at the detention hearing. First, defendant's sister, Laura Taylor, testified that defendant had been diagnosed with liver cancer and would need a liver transplant. If the court saw fit to release defendant before trial, he could live with her while receiving medical treatment. She also testified that she would ensure that her brother followed through with any conditions the court might set and inform the court if he violated any of them.

¶ 19　Defendant also called Jacque Rivera, who knew defendant from their incarceration together at Stateville Correctional Center. Rivera, who had spent 21 years in prison for murder, was released in 2011 after it came to light that Chicago police, headed by Detective Reynaldo Guevara, had suppressed the recantation of the lone witness to identify him as the perpetrator, and the State declined to recharge him. See *Rivera v. Guevara*, No. 12-CV-4428, 2018 WL 11468609, at \*1 (N.D. Ill. July 20, 2018).

¶ 20　Since Rivera's release, he has worked with people who had been incarcerated as they transitioned back into the community after their release. Rivera told the court he would help defendant receive medical treatment and ensure he followed any conditions the court might set.

¶ 21　Defendant submitted evidence that, via Pell grants, he had taken several courses and earned a GED, with an eye toward earning a bachelor's degree while incarcerated, even though he was serving a life sentence. And when Pell grants were disallowed for inmates, he continued to take courses, receiving certificates for the completion of many classes from Northern Illinois

and DePaul Universities.

¶ 22 Defendant also submitted a voluminous record of medical reports and explained their import. In a nutshell, defendant was diagnosed with hepatocellular carcinoma, or liver cancer, with at least one lesion on his liver determined to be cancerous and two others deemed "concerning" for cancer. The oncologist determined that defendant's treatment options included a resection to remove part of his liver (known as a hepatectomy) or a liver transplant, though the doctor was uncertain that these options would be viable given defendant's other medical conditions, such as "portal hypertension with splenomegaly and thrombocytopenia." Doctors had not yet confirmed whether defendant's cancer had spread beyond his liver.

¶ 23 Defendant likewise submitted records indicating a difficulty in obtaining treatment given his detention. He noted appointments that he missed because the Cook County Jail had no staff to transport him. There is also the matter of where a transplant operation would take place; defendant has been receiving treatment at Cook County Health, which cannot perform the transplant, and Cook County does not have a contract with the preferred hospital for performing a liver transplant, Rush Hospital.

¶ 24 The record also showed, via medical records and a proffer, that defendant suffers from "degenerative back disease, multiple gastric and esophageal varices, bulky porta-hepatic and mesenteric lymphadenopathy, a large splenorenal shunt, an enlarged spleen (which causes problems with his blood platelets), cirrhosis of the liver, and thrombocytopenia. He walks with a cane and is in need of a rollator to assist in his walking, as his pain is so great he sometimes needs to sit down immediately." The Cook County Jail has been unwilling or unable to provide him with a rollator (a traditional wheeled walker but with a seat).

¶ 25 Finally, defendant submitted written statements from some two dozen individuals

consisting of fellow inmates, non-inmates who have come to know defendant via prison visits, and an array of family members, all of which, in sum, attested to defendant's changed nature from the man charged with murder some 41 years ago. They promised a strong support network and claimed that he had, in various ways, inspired them as he struggled through decades of incarceration trying to better himself and others.

¶ 26    The State did not rebut or even attempt to rebut any of this testimony, other than to say that defendant's "200 pages of medical records that your Honor sifted through would be to the contrary, that he is, in fact, receiving medical care. It's not being withheld from him. He is receiving treatment and going to the hospital and doctors while being incarcerated."

¶ 27    Though the State had amended its petition for detention to allege that defendant was a flight risk as well as a threat, it put on no evidence of flight risk, as noted by the circuit court, which stated that "[t]his Court is not making any finding, and I don't believe the State asked regarding willful flight."

¶ 28    The circuit court found that the proof was evident or the presumption great that defendant had committed a detention-eligible offense. The court further found that the State had proven, by clear and convincing evidence, that

> "the defendant poses a real and present threat to the safety of any person or persons or the community based on the specific articulable facts of this case in that [defendant] stands accused of shooting the two individuals while they were in the trunk of the car. The defendants were reportedly identified by one of the decedents prior to his death, and [defendant] made admissions of the offense."

¶ 29    The court further found that no set of conditions could mitigate the threat posed by defendant, "because [defendant] is accused of shooting at two persons in the trunk of the

vehicle." This appeal followed.

¶ 30                                                    ANALYSIS

¶ 31    Under the new pretrial-release provisions in state law, all defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a), 110-6.1(e) (West 2022). The State may detain an accused if it establishes that the charged offense is eligible for detention and then proves that (1) the proof is evident or the presumption great that the defendant committed an offense which qualifies them for pretrial detention; (2) the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case; and (3) no condition or combination of conditions can mitigate that real and present threat. *Id.* § 110-6.1(e).

¶ 32    The State must prove each and every one of these three facts by clear and convincing evidence. *Id.* Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the mind of the fact finder about the truth of the proposition in question." (Internal quotation marks omitted.) *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. If the State fails to carry its burden on any of these three facts, the presumption of release remains, and detention is unlawful. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 33    Defendant does not dispute that the offenses of which he is charged qualify for detention. See *id.* § 110-6.1(a)(1.5) (forceable felonies, such as kidnapping, armed robbery, and murder, qualify for pretrial detention). Nor does he contest on appeal that the proof is evident or the presumption great that he committed the offenses. He challenges the court's findings that he poses a threat to an individual or the community and that no condition of combination of conditions could mitigate that risk.

¶ 34    Our standard of review is unsettled. The author of this opinion is of the belief that

detention orders should be subject to independent *de novo* review, with findings of historical fact reviewed for manifest error. See *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 80 (Ellis, J., specially concurring); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 67 (Ellis, J., specially concurring). The other panel justices believe that the first two factual findings—those of proof-evident and dangerousness or flight risk—should be reviewed for manifest error, while the third factual finding regarding conditions should be reviewed for an abuse of discretion. See *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36 (majority opinion); *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 44-50.

¶ 35 We need not decide the standard of review here, however, as our conclusion would be the same under any standard.

¶ 36 We begin with whether the State proved that defendant was a real and present threat. The new statute provides a non-exhaustive list of considerations that may factor into a determination of dangerousness, including the nature and circumstances of the offense; the defendant's criminal and social history; the identity of any individual whose safety would be threatened; any statements made by the defendant; the age and physical condition of the defendant and of any victim or complaining witness; the defendant's access to weapons; and whether the defendant committed any offense while on some form of release from custody. 725 ILCS 5/110-6.1(g) (West 2022).

¶ 37 As is common at pretrial detention hearings, the State proceeded by way of proffer. See *id.* § 110-6.1(f)(2). It is fair to say that this was no ordinary proffer, considering that the State could rely on evidence admitted at a trial at which defendant was convicted of these very charged crimes, however tainted that trial may be viewed in hindsight given the trial judge's corruption. The State also noted defendant's disciplinary record while incarcerated, which consisted mostly

of technical violations, the most recent of which was over 10 years ago.

¶ 38    We agree with the State that the crime as alleged was "intentional, calculated, heinous and depraved." Defendant is accused of participating in a scheme to bait two drug dealers, rob and kidnap them, drive them to a remote location, and kill them while they were tied up in the trunk of a car. Defendant also purportedly confessed to his role in the crime—though we recognize that he intends to challenge the voluntariness of his statement, something that could weigh in his favor. See *id.* § 110-6.1(f)(5) (evidence that proof of crime may have resulted from improper interrogation is relevant in assessing weight of evidence against defendant). But assuming his statement was voluntary, defendant admitted firing shots into the car, some of which killed two men. The crime was bold and brutal, something the State emphasizes more than once in its memorandum to this court.

¶ 39    But the law requires the State to prove that defendant "poses a real *and present* threat to the safety of any person or persons or the community, based on the specific articulable facts of the case." (Emphasis added.) *Id.* § 110-6.1(e)(2). The State presented no evidence that defendant posed anything close to the threat *today* that he may have posed over four decades ago. Nor did the State identify a specific individual to whom defendant would pose a threat. The evidence shows that the principal eyewitness to the crime, Gacho's girlfriend, is deceased, as is one of defendant's codefendants. The State has identified no witness or specific individual who might be at risk should defendant be released.

¶ 40    Nor did the State show that defendant poses a "real and present threat" (*id.*) to the community at large. The uncontradicted evidence at the hearing was that defendant is a seriously ill inmate with urgent medical needs who is unable to perform the most rudimentary functions, like walking, without assistance. Indeed, the State's proffer consisted of nothing more than its

recitation of the (admittedly brutal) facts of a 41-year-old crime. In many instances involving a crime of this nature, those allegations, alone, may justify pretrial detention. But not here, given the massive passage of time and the changes brought about in defendant—fortunate and unfortunate—over that window of time.

¶ 41    Under any standard of review we might employ, the State did not carry its burden of proving, by clear and convincing evidence, that defendant was a real and present threat to the safety of an individual or the community. We reverse the finding of dangerousness and order the defendant's pretrial release.

¶ 42    On remand, the circuit court may consider conditions for defendant's pretrial release. See *id.* §§ 110-2(b), 110-5(c).

¶ 43                                  CONCLUSION

¶ 44    The judgment of the circuit court is reversed. Defendant is entitled to pretrial release. The cause is remanded for the circuit court's consideration of conditions for his pretrial release. The mandate shall issue *instanter*.

¶ 45    Reversed and remanded with directions.

---

*People v. Sorrentino*, **2024 IL App (1st) 232363**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 83C00012702; the Hon. Adrienne E. Davis, Judge, presiding. |
| | |
| **Attorneys for Appellant:** | Casey McGushin, of Kirkland & Ellis LLP, of Chicago, for appellant. |
| | |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Paul E. Wojcicki, Assistant State's Attorney, of counsel), for the People. |